IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Wendell Jerome Brown, )<br>　　　　　　　　　　Plaintiff, )<br>)<br>　　vs. )<br>)<br>Carolyn W. Colvin, Acting )<br>Commissioner of Social Security, )<br>)<br>　　　　　　　　Defendant. )<br>_____ ) | Civil Action No. 6:15-2539-DCN-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits ("DIB") on October 9, 2012, alleging that he became unable to work on March 12, 2010. The application was denied initially and on reconsideration by the Social Security Administration. On January 18, 2013, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Stephen Ratliff, an impartial vocational expert, appeared at a hearing on November 5, 2013, considered the case *de novo* and, on January 16, 2014, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of

Social Security when the Appeals Council denied the plaintiff's request for review on May

5, 2015.  The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the

Commissioner has adopted the following findings of the ALJ:

(1)  The claimant meets the insured status requirements of the Social Security Act through September 30, 2011.

(2)  The claimant has not engaged in substantial gainful activity during the period from his alleged onset date of March 12, 2010, through his date last insured of September 30, 2011 (20 C.F.R. § 404.1571 *et seq*).

(3)  Through the date last insured, the claimant has the following severe impairments:  lumbar degenerative disc disease and borderline intellectual functioning (20 C.F.R. § 404.1520(c)).

(4)  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(5)  After careful consideration of the entire record, I find that through the date last insured, the claimant had the residual functional capacity to perform sedentary work[1] as defined in 20 C.F.R. 404.1567(a) except with a sit/stand option changing position every thirty minutes, occasional postural activities, no climbing ladders, ropes, of scaffolds, avoiding concentrated exposure to work hazards, and simple routine repetitive tasks.

(6)  Through the date last insured, the claimant is unable to perform any past relevant work (20 C.F.R. § 404.1565).

(7)  The claimant was born on January 29, 1971, and was 40 years old, which is defined as a younger individual age 18-44, on the date last insured (20 C.F.R. § 404.1563).

(8)  The claimant has a limited education and is able to communicate in English (20 C.F.R. § 404.1564).

---

[1]  Sedentary exertional work involves lifting and carrying no more than ten pounds at a time, sitting for six hours in an eight-hour workday, and standing and walking for two hours in an eight-hour workday.

(9)    Transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that the claimant is "not disabled," whether or not claimant has transferable job skills (*See* SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that claimant could have performed (20 C.F.R. § 404.1569 and 404.1569(a)).

(11)  The claimant was not under a disability, as defined in the Social Security Act, at any time from March 12, 2010, the alleged onset date, through September 30, 2011, the date last insured (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2)  has a severe impairment, (3)  has an impairment that equals an illness contained in the Social Security Administration's Official Listings of

3

Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a

4

preponderance.  If there is evidence to justify a refusal to direct
a  verdict were the case before a jury, then there is "substantial
evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 39 years old on his alleged disability onset date (March 12, 2010), and he was 40 years old on his date last insured (September 30, 2011) (Tr. 44).  He dropped out of school in the tenth grade (Tr. 44).  The plaintiff has been a landscaper and worked as a concrete finisher for nine years (Tr. 58-59, 202).  He last worked as a greens keeper for a golf course, and he stopped working in March 2010 (Tr. 43, 59).

The plaintiff injured his lower back on March 12, 2010, after he fell at work. Two weeks later, he presented to his primary care physician, complaining of back pain.  An examination showed tenderness to palpation and muscle spasm, and the plaintiff was diagnosed with a low back strain and muscle spasm.  He was given medication and advised to perform stretching exercises, apply moist heat, and "do some light duty for a couple of days."  He returned to his physician two days later because he lost his medication.  Upon examination, he had back tenderness and was "very exaggeratedly tender," but he had no muscle spasm (Tr. 273).

The plaintiff underwent an MRI on April 12, 2010 (Tr. 275).  The imaging showed disc protrusion at L4-L5 and L5-S1 resulting in abutment of the L4 nerve room and impingement of the L5 nerve roots (Tr. 276).  On May 17, 2010, the plaintiff followed up with

James K. Aymond, M.D., an orthopedist.  Dr. Aymond observed that the plaintiff walked with a slow and deliberate gait with a cane, and his lumbar flexibility was self-limiting. Palpation over his lower back produced a non-physiologic response with respect to hyper-stimulation.  Dr. Aymond reviewed the MRI, and observed L4-L5 right paracentral disk protrusion.  He recommended that the plaintiff undergo lumbar injections, but the plaintiff declined that treatment.  As a result, Dr. Aymond stated "then he is released at this time from my care and can perform sedentary work activities" (Tr. 282).  The plaintiff returned to Dr. Aymond in July 2010 and again declined the recommended injections.  Dr. Aymond found that the plaintiff would not benefit from further orthopedic treatment and referred him to pain management (Tr. 284).

The plaintiff presented to the Colleton Medical Center Emergency Room on August 1, 2010, complaining of chronic back pain (Tr. 291).  He had moderate soft tissue tenderness in his back, and moderately limited decrease in his lumbar flexion and extension (Tr. 292).  He had no sensory deficit, no motor deficit, and normal reflexes (Tr. 291-92).  A functional assessment stated: "no impairments noted" (Tr. 295).  He was diagnosed with a lumbar strain and advised to take warm soaks, avoid operating machinery or driving, limit his lifting, and avoid "strenuous" activity (Tr. 293).

In November and December 2010, the plaintiff presented to John F. Johnson, M.D., of the Southeastern Spine Institute.  Dr. Johnson noted that three prior surgeons "felt he did not have any surgical indications." His examination was "essentially unchanged."  Dr. Johnson recommended lumbar epidural injections (Tr. 302-303).  The plaintiff underwent a L5/S1 lumbar epidural steroid injection on December 27, 2010 (Tr. 314).

When the plaintiff returned to Dr. Johnson on January 20, 2011, he reported improvement with the injection, but he still reported pain in his right leg.  Dr. Johnson noted that the plaintiff still had fairly significant symptoms in his right lower extremity and that he would get relief by standing straight, but virtually in any position sitting, standing, or lying

6

would cause worsening of his symptoms. His physical examination was "essentially unchanged," but Dr. Johnson provided no further description of the examination findings. Dr. Johnson recommended repeating the injection (Tr. 304).

In a check-the-box form submitted to the Colleton County Family Court and dated March 4, 2011, Dr. Johnson indicated that the plaintiff was "permanently and totally disabled" (Tr. 358).

On March 24, 2011, the plaintiff presented to the emergency room with complaints of chronic back pain. Upon examination, he was under no acute distress, his back was tender with muscle spasm, but he had normal range of motion. His extremities were non-tender, he had normal range of motion, and he showed no motor deficits. He was advised to limit his lifting and have no "strenuous" activity (Tr. 288-89).

In April 2011, the plaintiff presented to Dayana Lowndes-Rosen, M.D., a psychiatrist, upon referral by his attorneys for the purpose of his worker's compensation claim (Tr. 400).[2] He had no delusions, obsessions, compulsions, or phobias. He had no hallucinations or suicidal ideation (Tr. 402). His sensorium and cognition were clear with no observed problems with orientation, attention, concentration, or memory. His IQ was normal as well (id.).

The plaintiff had a repeat lumbar injection on April 25, 2011, and returned to Dr. Johnson on July 7, 2011 (Tr. 313, 305). The plaintiff acknowledged brief improvement with the injection but complained that his condition worsened (Tr. 305). Dr. Johnson found that the plaintiff had decreased range of motion and a positive straight leg raise test. The doctor stated that he was concerned that the plaintiff had a worsening of his condition and that he had either had a disc disruption or a bigger cyst causing stenosis. Dr. Johnson recommended an MRI scan and a surgical consultation (id.).

_____

[2] This evidence was not submitted to the ALJ, but was made a part of the record by the Appeals Council following the ALJ's decision (Tr. 399).

An MRI on July 28, 2011, showed minimal disc degeneration with disc bulging and facet arthritis at L4-L5, as well as minimal disc degeneration with neural foramina narrowing (Tr. 277). On August 15, 2011, the plaintiff followed up with R. Blake Dennis, M.D., of the Southeastern Spine Institute for a surgical consultation (Tr. 306-07). On physical examination, "no reliable information can be obtained" (Tr. 306). Dr. Dennis found that the MRI suggested minimal annular fissuring, but the quality of the imaging was poor (*id*.). He did not recommend surgery, but rather suggested additional imaging studies, an injection, and conservative care follow-up (Tr. 307). The plaintiff underwent a right L5-S1 epidural injection on August 26, 2011 (Tr. 312).

On November 7, 2011, plaintiff returned to Dr. Dennis after undergoing another MRI (Tr. 308, 315). It showed mild non-compressive spondylosis and annular tears at L4-5 and L5- S1 (Tr. 315). There was minimal signal loss at L4-5, no evidence of nerve root compression or intra-canal pathology, and normal disc space heights (Tr. 308). The plaintiff received an L5-S1 injection that helped more than previous injections (*id*.). Dr. Dennis opined that surgery would not likely have a high success rate, no more than 20%, so he recommended another injection with conservative care follow-up (Tr. 308). The plaintiff had another injection a week later on November 15, 2011 (Tr. 311).

The plaintiff saw Dr. Dennis again on December 7, 2011 (Tr. 310). The plaintiff had no lumbar spasm or tenderness and retained normal strength in his legs. Dr. Dennis explained that the plaintiff's lumbar MRI "shows minimal if any abnormality at all. Certainly no abnormality that would explain his pain." He further explained that the plaintiff's "pain is global and his pain is not consistent with localized right-sided pathology." Dr. Dennis concluded that no surgical procedure could improve his condition and recommended a referral to pain management for a spinal cord stimulator (*id*.).

On December 30, 2011, Dr. Johnson signed a check-box/fill-in-the-blank form regarding the plaintiff's functional abilities (Tr. 348). He checked a box stating that the

8

plaintiff was permanently and totally disabled as a result of his injuries (Tr. 346). He also filled in answer choices to indicate that the plaintiff could sit, stand, or walk for only ten minutes at a time (Tr. 347). This form also referenced a March 4, 2011, form where Dr. Johnson checked a box to indicate that the plaintiff was permanently and totally disabled (Tr. 346, 358).

On January 20, 2012, the plaintiff presented to Ellen E. Rhame, M.D., of the Palmetto Comprehensive Center for Pain. She found that the plaintiff was well-developed, well-nourished, and in no acute distress. The plaintiff was not open to treatment and was minimally cooperative with his examination. His lumbar spine was exquisitely tender, consistent with hyperalgesia. His nerves were intact, with decreased sensation. Dr. Rhame could not assess the plaintiff's strength due to a combination of his poor effort and guarding. Straight leg raise testing reproduced low back pain but no leg pain. The plaintiff declined any injection therapy and was resistant to most therapies. Dr. Rhame assessed lumbar radiculopathy and lumbar degenerative disc disease. Dr. Rhame noted that epidurals in the past had been only minimally helpful for a short period of time and opined that spinal cord stimulation could be helpful (Tr. 367-70).

On February 20, 2012, at the referral of Dr. Rhame, the plaintiff presented to Sally Duffy, Ph.D., a psychologist (Tr. 364-66). She noted that he reported impaired memory and concentration and had marital problems attendant to his pain (Tr. 366). She recommended psychological care to assist him in handling his pain (*id*.).

Thereafter, from February 2012 to August 2013, the plaintiff presented to the pain clinic approximately every other month (Tr. 324-30, 371-80). Upon examination, he was "exquisitely hyperalgesic to light touch" (Tr. 330). His straight leg raise was positive at times, but negative at others (Tr. 324-30, 371-80). His muscle strength was 4/5 or 5/5, and his muscle tone, motor skills, and nerves were grossly intact (*id*.). He continued to resist treatment, but acknowledged that a TENS unit helped him (Tr. 378). In addition, he denied

drug use, but tested positive for cocaine, so the pain clinic stopped prescribing narcotic pain medications (Tr. 380).

After two treatment sessions, on March 12, 2012, Dr. Rhame completed a form very similar to the form signed by Dr. Johnson on December 31, 2011 (Tr. 382). She checked the "Yes" box to the question of whether the plaintiff could lift no more than five pounds, and sit, walk, or stand for no more than ten minutes at a time (*id.*).

On March 29, 2012, Joel D. Leonard, a vocational consultant, conducted a vocational evaluation of the plaintiff (Tr. 189-98). In his report, Mr. Leonard noted that the plaintiff had significant academic intellectual deficits in that his competencies were "extremely limited in that any work he that did have would be learned from demonstrated and experimental means." Mr. Leonard further noted that the plaintiff would perform poorly on any pre-employment testing. Mr. Leonard administered IQ testing, which placed the plaintiff's IQ in the range of 55-62. He noted that "[t]aken at face value, the plaintiff's scores suggest the presence of significant academic and intellectual deficits." Mr. Leonard found that the plaintiff's competencies were limited, but acknowledged that the plaintiff could read, perform basic math, and apply modest principles of reasoning and analysis. He also acknowledged that the plaintiff's work as a landscaper was semi-skilled. Mr. Leonard concluded that the plaintiff could not perform sedentary work and "it is my professional opinion that he is totally disabled" (Tr. 189-98). On April 5, 2012, Mr. Leonard wrote a letter to the plaintiff's worker's compensation attorney stating his belief that the plaintiff "is incapable of competitive work activity" and offering the conclusion that the plaintiff's overall vocational profile fell below the expected standards of gainful employment and that the plaintiff was totally disabled (Tr. 189).

On December 28, 2012, Tom Brown, M.D., a state agency physician, prepared a physical residual functional capacity ("RFC") assessment (Tr. 85-86). Dr. Brown found that the plaintiff could occasionally lift or carry up to 20 pounds and could frequently lift ten

10

pounds (Tr. 85).  He could stand, walk, or sit for six hours an in eight hour day and would

be limited to occasional postural activities, like climbing, stooping, crouching, or crawling (Tr.

85-86).  On that same date, Lisa Clausen, Ph.D., a state agency psychologist, found that

there was insufficient evidence to support the plaintiff's claim of an affective or anxiety

disorder (Tr. 83-84).  She noted that the record contained no indication that the plaintiff was

diagnosed or treated for a mental health disorder (Tr. 84).

   Testing in tenth grade showed the plaintiff had an IQ between 66 and 75 (Tr.

261).  At the time of the hearing, the plaintiff lived with his father and mother (Tr. 46). He

watched television, went to church about once every three months, and was able to drive

(Tr. 47-48). The plaintiff had five children, ages 13 to 22 (Tr. 48).  The plaintiff visited with

his 13 year old daughter (Tr. 48-49).  The plaintiff testified that his daughter would come by

to visit him to see how he was doing and that he did nothing with her.  The daughter's visits

lasted for only 30 minutes (Tr. 49).  The plaintiff further testified that he makes a sandwich

maybe once a month and that he relies on his mother to prepare meals for him (Tr. 55).

The plaintiff testified that he goes to a local store occasionally to purchase chips and a

soda; however, when it came to going to doctor appointments, his father had to drive him

due to pain and the side effects of medications he takes (Tr.48).

   During the administrative hearing, the ALJ asked the vocational expert to

consider a hypothetical individual with the plaintiff's vocational profile and with the following

workplace limitations: light work, occasional postural activities, no climbing ladders or

scaffolds, avoid concentrated exposure to work hazards, and simple, repetitive, routine

tasks (Tr. 63). The ALJ then asked the same questions, with the same limitation but adding

additional limitations to sedentary work with a sit/stand option every 30 minutes.  The

vocational expert identified the jobs of order clerk, surveillance system monitor, and

addresser (Tr. 64). The vocational expert noted that the *Dictionary of Occupational Titles*

did not characterize jobs according to sit/stand options, but in the expert's professional

experience and observation of those jobs, the jobs could be accomplished with sit/stand options with the worker remaining on task (Tr. 64). When further questioned about concentration difficulties of one or two hours a day, the vocational expert responded that would eliminate all jobs (Tr. 65).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) failing to find that he was disabled pursuant to Listing 12.05(C); (2) finding he could work at the sedentary level, (3) discounting the opinion of treating physician Dr. Johnson; (4) giving significant weight to the opinions of the state agency consultants; and (5) failing to ask proper hypothetical questions to the vocational expert and ignoring favorable testimony on cross-examination.

### *Listing 12.05(C)*

The plaintiff first argues that the ALJ erred in finding his impairments did not meet or equal Listing 12.05(C) (Intellectual Disability). The regulations state that upon a showing of a listed impairment of sufficient duration, "we will find you disabled without considering your age, education, and work experience." 20 C.F.R. § 404.1520(d). A listing analysis includes identifying the relevant listed impairments and comparing the criteria with the evidence of the plaintiff's symptoms. *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (stating that "[w]ithout such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination").

An individual does not meet Listing 12.05(C) unless his impairment satisfies both the diagnostic description in the introductory paragraph of the listing and the criteria of paragraph C. 20 C.F.R. pt. 404, subpt. P, app.1, § 12.00A. Listing 12.05 provides in pertinent part:

> *Intellectual Disability*: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the

12

developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

*** 

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

*** 

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05(C).

As set forth above, to meet the diagnostic description or "capsule definition" of intellectual disability, an individual must have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period [i.e., onset before age 22]." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.05. This has been described by the Fourth Circuit Court of Appeals as "Prong 1" of Listing 12.05. *See Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012)."'[A]daptive functioning' refers to the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of his/her same age. . . ." POMS § DI 24515.056(D)(2), https://secure.ssa.gov/apps10/poms.nsf/lnx/0424515056. "Deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012) (citing *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002)). "If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria [paragraphs A through D], we will find that [the] impairment meets the listing." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(A).  "At issue in this case was Requirement C, which requires '[a] valid verbal, performance, or full scale IQ of 60 through

13

70' ("Prong 2"), as well as 'a physical or other mental impairment imposing an additional and significant work-related limitation of function' ('Prong 3')." *Hancock*, 667 F.3d at 473.

At step three of the sequential evaluation process, the ALJ specifically considered Listing 12.05(C) and found that the plaintiff did not have the cognitive or functional deficits necessary to meet or equal the criteria of the listing (Tr. 26-27). The ALJ acknowledged the school records listing the plaintiff's IQ as between 66 and 75 (Tr. 26; *see* Tr. 261). However, the ALJ found the IQ scores "to be an underestimate of [the plaintiff's] mental abilities and, quite likely, a result of behavioral issues existing at the time of the testing, the severity of which has not been objectively shown to persist" (Tr. 26). As argued by the plaintiff and conceded by the Commissioner, the behavioral issues referenced by the ALJ cannot be identified in the record (def. brief at 11 n.4; pl. brief at 3-4). However, even if the ALJ erred in finding that the IQ scores were not valid, such error was harmless as the ALJ's finding that the record did not support deficits in adaptive functioning is supported by substantial evidence as will be discussed below (Tr. 26 ("Even assuming the reported IQ scores are valid, there is no evidence of deficits in adaptive functioning.")). *See Hancock v. Astrue*, 667 F.3d 470, 475 (4th Cir. 2012) *(*"Therefore, even if the ALJ's finding concerning Prong 2 of Listing 12.05C did not rest on substantial evidence, we would still be required to affirm the ALJ's decision if his finding with regard to Prong 1 was based on substantial evidence."). *See also Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."); *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir.1994) (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).

In finding the record did not contain evidence of deficits in adaptive functioning, the ALJ noted that the plaintiff has a history of performing semi-skilled work (Tr. 26). The plaintiff performed both semi-skilled work as a landscaper and groundskeeper and skilled work as a concrete finisher (Tr. 62). *See Hancock*, 667 F.3d at 475-76 & n.3 (holding

14

that evidence was sufficient to support ALJ's conclusion that claimant had no deficits in adaptive functioning where, among other things, claimant worked several jobs and performed a variety of tasks which would be expected to be beyond the capacity of a mentally retarded person). This court has repeatedly upheld an ALJ's finding that a claimant did not have deficits in adaptive functioning based in part on a past ability to perform semi-skilled or skilled work. *See Weatherford v. Colvin*, C.A. No. 6:13-1885-RMG, 2014 WL 3881056, at *10 (D.S.C. Aug. 5, 2014); *Weedon v. Astrue*, C.A. No. 11–2971–DCN–PJG, 2013 WL 1315311, at *7 (D.S.C. Jan. 31, 2013), *adopted by* 2013 WL 1315206 (D.S.C. Mar. 28, 2013); *Jenkins v. Astrue*, C.A. No. 09–1653–JFA–PJG, 2010 WL 3168269, at *5 (D.S.C. Mar. 22, 2010), *adopted by* 2010 WL 3168268 (D.S.C. Aug.4, 2010).

Further, the ALJ noted that the plaintiff was able to obtain a driver's license, drive an automobile, prepare simple meals, and shop (Tr. 26).  Although he completed only ninth grade, the plaintiff was not illiterate and was able to read, perform basic math, and apply modest principles of reasoning and analysis (Tr. 26). *See Sims v. Colvin*, C.A. No. 6:12-CV-3332-DCN, 2014 WL 793065, at *10-11 (D.S.C. Feb. 24, 2014) (finding claimant's activities contributed to substantial evidence that she did not establish deficits in adaptive functioning). The ALJ also noted that no treating physician gave any indication that the plaintiff had borderline intellectual functioning or significant intellectual deficits, and the plaintiff was able to recount his medical history, follow instructions, and participate in his medical evaluations (Tr. 26). *See Satterwhite v. Colvin*, C.A. No. 5:14-CV-01152-JMC, 2015 WL 5054559, at *8 (D.S.C. Aug. 25, 2015) ("medical reports from Plaintiff's long-term treating physician at Millstone Family Medicine do not include references to complaints about or findings of low intellectual function, mental retardation, or intellectual disability").

In arguing that his impairments meet or equal Listing 12.05(C), the plaintiff relies on Mr. Leonard's opinion and argues that his records "should have been considered" even though they were dated after his date last insured ("DLI") (pl. brief at 4). As noted

above in greater detail, Mr. Leonard, a vocational consultant, evaluated the plaintiff in March 2012 and concluded that the plaintiff could not perform even sedentary work and "it is my professional opinion that he is totally disabled" (Tr. 189-98). Mr. Leonard administered IQ testing, which placed the plaintiff's IQ in the range of 55-62 (*id.*). Also, in April 2012, Mr. Leonard wrote a letter to the plaintiff's worker's compensation attorney stating his belief that the plaintiff "is incapable of competitive work activity" and offering the conclusion that the plaintiff's overall vocational profile fell below the expected standards of gainful employment and that the plaintiff was totally disabled (Tr. 189). Importantly, the ALJ did consider Mr. Leonard's findings, cited to them, weighed them, and explained why he afforded them little weight (Tr. 26, 32).

The plaintiff argues that the ALJ did not comply with *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340 (4th Cir. 2012) in giving minimal weight to Mr. Leonard's opinion (pl. brief at 5). However, *Bird* merely acknowledges that post-DLI evidence "may be relevant to prove a disability arising before the claimant's DLI." 699 F.3d 337, 340 (4th Cir. 2012). As the court stated in *Bird*, "retrospective consideration of evidence is appropriate when 'the record is not so persuasive as to rule out any linkage' of the final condition of the claimant with his earlier symptoms." *Id.* at 341 (quoting *Moore v. Finch*, 418 F.2d 1224, 1226 (4th Cir. 1969)). Here, the ALJ complied with *Bird* and considered the evidence from after the plaintiff's DLI, including Mr. Leonard's opinion. The ALJ afforded Mr. Leonard's conclusions little weight, noting they were based on the plaintiff's subjective complaints (Tr. 32). "'An ALJ may properly reject a doctor's opinion if it appears to be based on a claimant's exaggerated subjective allegations.'" *Dennis v. Colvin*, C.A. No. 0:12-1517-PJG, 2013 WL 4495962, at *5 (D.S.C. Aug. 21, 2013) (quoting *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001)). The ALJ further noted that Mr. Leonard reasoned that the plaintiff's ability to work was dependent on his "physical prowess," which was contradicted by the vocational expert's testimony (Tr. 32; *see* Tr. 195). Specifically, the vocational expert found that the

16

plaintiff could perform jobs that did not require physical prowess, such as addresser, order clerk, and surveillance system monitor (Tr. 34; *see* Tr. 64). Moreover, the ALJ noted that Mr. Leonard himself acknowledged that the plaintiff could read, perform basic math, and apply modest principles of reasoning and analysis (Tr. 26). Similarly, Mr. Leonard relied on the plaintiff's lack of computer literacy and lack of past clerical work to establish disability, which is inconsistent with the Commissioner's ruling on unskilled sedentary work (Tr. 195).  *See* SSR 96-9p, 1996 WL 374185, at *1 ("[A] finding that an individual has the ability to do less than a full range of sedentary work does not necessarily equate with a decision of 'disabled.' If the performance of past relevant work is precluded by an RFC for less than the full range of sedentary work, consideration must still be given to whether there is other work in the national economy that the individual is able to do, considering age, education, and work experience."). As noted by the Commissioner, "[v]ocational expert testimony can assist in determining the extent to which specific functional limitations erode the base of available sedentary, unskilled jobs" (def. brief at 13).  Here, the ALJ obtained such vocational expert testimony and found that the plaintiff was capable of making a successful adjustment to other work that existed in significant numbers in the national economy (Tr. 34-35).  *See id.* at *9 ("The vocational resource may be asked to provide any or all of the following: An analysis of the impact of the RFC upon the full range of sedentary work, which the adjudicator may consider in determining the extent of the erosion of the occupational base, examples of occupations the individual may be able to perform, and citations of the existence and number of jobs in such occupations in the national economy.").

The ALJ also noted that Mr. Leonard was not a treating source, as his report was generated for the purpose of the plaintiff's worker's compensation claim and not for treatment (Tr. 32; *see* Tr. 189). In addition, Mr. Leonard merely offered the conclusion that the plaintiff was disabled, without identifying any specific functional limitations (Tr. 32; *see* Tr. 195-96). As the ALJ noted, this conclusion is reserved to the Commissioner (Tr. 32), and

thus does not warrant significant weight. 20 C.F.R. § 404.1527(d)(1); SSR 96-5p, 1996 WL 374183, at *5. The plaintiff also contends that his diagnosis by Dr. Lowndes-Rosen of mood disorder with depressive feature or major depressive-like episode along with problems with insomnia and social occupational functioning supports his claim of deficits in adaptive functioning (pl. brief at 4; *see* Tr. 400-403). However, Dr. Lowndes-Rosen specifically noted in her mental status examination that the plaintiff's "[s]ensorium and cognition were clear with orientation, attention, concentration, and memory. His assessed level of intelligence was of normal IQ" (Tr. 402). The plaintiff also cites the records of Dr. Duffy, a psychologist, who found in February 2012 that the plaintiff was severely and profoundly depressed with symptoms of severely diminished stress tolerance and social withdrawal along with impaired memory and concentration (Tr. 365-66). The plaintiff argues that the records "should be considered since this shows a continuation of his treatment from Southeastern Spine in which it was stated that he had significant depressive symptoms" (pl. brief at 5). However, as noted by the Commissioner, the ALJ noted that the plaintiff continued his treatment after the DLI (September 30, 2011) and discussed the Southeastern Spine records from the relevant period and continuing into December 2011 (Tr. 29-32). In addition, the plaintiff saw Dr. Duffy only twice, both times in February 2012, over four months after the relevant period, and Dr. Duffy made no findings of deficits in intellectual functioning, did not identify any specific functional limitations, and her records do not relate back to the period before the DLI (Tr. 364-66).

Based upon the foregoing, the ALJ did not err in his consideration of Mr. Leonard's opinion, and substantial evidence supports the ALJ's decision to afford it little weight. Furthermore, substantial evidence supports the ALJ's conclusion that the plaintiff lacked the necessary deficits in adaptive functioning to meet Prong 1 of Listing 12.05(C). Accordingly, this allegation of error is without merit.

***Medical Opinions***

The plaintiff next argues that the ALJ erred in finding that he could work at the sedentary level and in discounting the opinion of treating physician Dr. Johnson.  The ALJ found that the plaintiff could perform sedentary work with a sit/stand option, changing position every 30 minutes; occasional postural activities; no climbing; avoiding concentrated exposure to workplace hazards; and simple, routine, repetitive tasks (Tr. 27).

Social Security Ruling ("SSR") 96-8p provides in pertinent part:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations).  In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record.  The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p, 1996 WL 374184, at *7 (footnote omitted).  Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*  Moreover, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

Here, the ALJ specifically considered Dr. Johnson's treatment records and opinion in making the RFC finding (Tr. 29, 31-32).  On December 30, 2011, Dr. Johnson signed a check-box/fill-in-the-blank form regarding the plaintiff's functional abilities (Tr. 348). He checked a box stating that the plaintiff was permanently and totally disabled as a result of his injuries (Tr. 346).  He also filled in answer choices to indicate that the plaintiff could sit, stand, or walk for only ten minutes at a time and that the plaintiff had a 10% whole

19

person permanent (Tr. 347). This form also referenced a March 4, 2011, form where Dr. Johnson checked a box to indicate that the plaintiff was permanently and totally disabled (Tr. 346, 358).

The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 404.1527(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 404.1527(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled" or "unable to work" or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 404.1527(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

20

6:15-cv-02539-DCN    Date Filed 07/13/16    Entry Number 23    Page 21 of 27

The ALJ gave little weight to Dr. Johnson's opinion, finding it was inconsistent with the weight of the evidence (Tr. 31-32). The ALJ noted that Dr. Johnson did not provide any explanation for his conclusions and there were no real examination findings by Dr. Johnson, while the opinion of Dr. Dennis was supported by physical examination and MRI studies (Tr. 31). The ALJ also gave significant weight to Dr. Dennis' finding that the plaintiff's global pain was inconsistent with localized pathology and that the MRI showed minimal if any abnormalities and did not explain his pain (Tr. 31; *see* Tr. 310). The ALJ also gave significant weight to the May 2010 opinion of Dr. Aymond that the plaintiff could perform sedentary work activities (Tr. 28, 31; *see* Tr. 282).The ALJ afforded considerable weight to the opinion of state agency medical consultant Dr. Brown, who opined that the plaintiff could perform a range of light work, although in giving the plaintiff the benefit of the doubt he restricted the plaintiff to sedentary work with additional environmental limitations (Tr. 32; *see* Tr. 85-86). Thus, other physicians contradicted Dr. Johnson's opinion of completely debilitating limitations.

Moreover, treatment records provide greater support for the opinions of Drs. Aymond, Dennis, and Brown. Dr. Johnson simply completed a check-box form without any explanation for his conclusions, and, as noted by the ALJ, his treatment notes provide no real examination findings (Tr. 31). Rather, Dr. Johnson's treatment notes merely state repeatedly that the plaintiff's examination findings were "unchanged" (Tr. 302-04). Other examination findings were not consistent with debilitating limitations. When the plaintiff initially injured his back, he was diagnosed with a low back strain, given stretching exercises, and told to "do some light duty for a couple of days" (Tr. 28; *see* Tr. 273). Dr. Aymond observed that the plaintiff's flexibility was self-limiting and palpation of his lower back produced non-physiologic response with respect to hyper-stimulation (Tr. 28; *see* Tr. 282). Dr. Aymond also found that there was no orthopedic treatment that could help the plaintiff (Tr. 282). As noted by the ALJ, examinations generally showed normal range of

motion in the plaintiff's extremities, normal strength in his extremities, no extremity tenderness, normal muscle tone, and normal motor and sensory function (Tr. 29- 30; *see* Tr. 291-92, 289, 324, 326).  As the ALJ observed, the record did not show any signs of muscular atrophy, strength deficits, circulatory compromise, neurological deficits, or other indicators of long-standing, severe or intense pain, and/or physical inactivity (Tr. 30). Objective findings were minimal, showing well maintained disc space heights, minimal if any annular fissuring, and mild non-compressive spondylosis (Tr. 29; *see* Tr. 277, 282, 306, 308). Dr. Dennis explained that the MRI showed "minimal if any abnormality at all" (Tr. 29; *see* Tr. 310).

        The plaintiff argues that the ALJ erred in giving weight to the opinions of the state agency consultants because they did not have access to the records of Mr. Leonard, Dr. Lowndes-Rosen, or Dr. Duffy and did not consider the records after the DLI (pl. brief at 8).  The ALJ gave "considerable weight" to the opinions of the state agency consultants, finding they were consistent with the objective evidence of record (Tr. 32).  An ALJ may rely on a medical source opinion that did not have access to the entire medical record, so long as the ALJ considered the entire evidentiary record and substantial evidence supports the ALJ's decision. *Thacker v. Astrue*, No. 11-246, 2011 WL 7154218, at *6 (W.D.N.C. Nov. 28, 2011), *adopted by* 2012 WL 380052 (W.D.N.C. Feb. 6, 2012).  The ALJ was required to consider the state agency physician assessments as opinion evidence. *See* 20 C.F.R. § 404.1527(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation.  Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."). *See* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of

22

treating or examining sources."); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984) ("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted).

Here, the plaintiff's sole argument about his mental condition relates to his intellectual functioning (pl. brief at 3-5, 10-14). While the state agency psychological consultant did not have all the record evidence and specifically did not have the records of Mr. Leonard, Dr. Lowndes-Rosen, and Dr. Duffy, the ALJ specifically weighed and considered Dr. Leonard's findings and explained why he gave the evidence little weight, as discussed above (Tr. 32). Further, with regard to the records of Drs. Duffy and Lowndes-Rosen, as discussed above, they do not support the plaintiff's argument that his impairments meet or equal listing 12.05(C). Specifically, Dr. Duffy made no finding of deficits in intellectual functioning, and her opinions do not relate to the period before the DLI (Tr. 359-66). Although Dr. Lowndes-Rosen's records relate to April and August 2011, she specifically found that the plaintiff had a normal IQ (Tr. 402).

Based upon the foregoing, the undersigned finds no error in the ALJ's decision to give considerable weight to the opinions of the state agency consultants. Furthermore, substantial evidence supports the ALJ's assessment of Dr. Johnson's opinion and the finding that the plaintiff was able to perform a limited range of sedentary work with a sit/stand option, postural and environmental limitations, and limitation to simple, routine, repetitive tasks (Tr. 27).

### *Vocational Expert*

The plaintiff argues that the ALJ erred in relying on the testimony of the vocational expert as it was based on a flawed hypothetical. The plaintiff's argument relies on his argument discussed above that the ALJ did not properly formulate his RFC. For the

23

reasons stated above, the plaintiff has failed to demonstrate that the ALJ's determination of the RFC finding is unsupported by substantial evidence. Therefore, this argument also fails. *See Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir.2005) (noting that "the ALJ must accurately convey to the vocational expert all of a claimant's *credibly established limitations*") (emphasis in original); *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir.1989) ("In order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of [the] claimant's impairments.") (internal citations omitted).

The plaintiff first argues that the ALJ should have included additional limitations, beyond simple, routine, repetitive tasks, to account for his borderline intellectual functioning and concentration limitations (pl. brief at 9-10). However, the ALJ adequately weighed the intellectual functioning and moderate concentration limitations, and substantial evidence supports the ALJ's determination that simple, repetitive tasks accounted for the plaintiff's limitations from his intellectual functioning (Tr. 27, 33). As discussed above, despite his intellectual limitations, the plaintiff was able to perform semi-skilled and skilled work (Tr. 62); he was not illiterate and was able to read, perform basic math, and apply modest principles of reasoning and analysis (Tr. 26); and he was able to obtain a driver's license, drive an automobile, prepare simple meals, shop, visit with his daughter, and attend church occasionally (Tr. 26-27).

The plaintiff argues that the notes of Drs. Rhame and Dr. Duffy show additional concentration limitations that were not accounted for in the hypothetical question (pl. brief at 10). However, neither Dr. Duffy nor Dr. Rhame related their findings back to the period before the DLI (Tr. 366 (Dr. Duffy); Tr. 367 (Dr. Rhame)). In addition, neither expressed the extent of the plaintiff's limitations in this regard. Dr. Duffy noted the plaintiff's subjective report of "impaired memory and concentration" (Tr. 366), and Dr. Rhame simply

24

stated that the plaintiff's pain affected his concentration (Tr. 367). Thus, neither made any finding on the extent of the plaintiff's limitations, and both merely memorialized the plaintiff's subjective claims, which the ALJ found were not entirely credible (Tr. 30). *See Riegel v. Colvin*, C.A. No. 7:12-cv-00526, 2014 WL 462525, at *6 (W.D. Va. Feb. 5, 2014) ("The fact that medical practitioners documented [the claimant's] subjective complaints in their treatment notes during her visits does not transform those complaints into clinical evidence") (citation omitted). Moreover, the ALJ explained that he afforded little weight to Dr. Rhame's opinions, as her opinion was based on an examination where the plaintiff did not cooperate, he stood throughout the entire examination, and MRI evidence did not support such restrictive findings (Tr. 31; *see* Tr. 367-70, 381-82).

 While not argued by the plaintiff, the undersigned has considered the impact of the decision by the Court of Appeals for the Fourth Circuit in *Mascio v. Colvin,* 780 F.3d 632 (4th Cir. 2015), which was decided over a year after the ALJ's decision in this case.  In *Mascio*, the court stated, "[W]e agree with other circuits that an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'"  780 F.3d at 638 (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011) (joining the Third, Seventh, and Eighth Circuits)).   The court further stated:

> Perhaps the ALJ can explain why [the claimant's] moderate limitation in concentration, persistence, or pace at step three does not translate into a limitation in Mascio's residual functional capacity. For example, the ALJ may find that the concentration, persistence, or pace limitation does not affect Mascio's ability to work, in which case it would have been appropriate to exclude it from the hypothetical tendered to the vocational expert. . . . But because the ALJ here gave no explanation, a remand is in order.

*Id.*  (citation omitted).

Here, the ALJ found at step three that the plaintiff had moderate limitations in concentration, persistence, and pace (Tr. 27) and stated as follows in the RFC assessment:

> I have also considered the claimant's history of borderline intellectual functioning by limiting him to the performance of simple routine repetitive tasks.  Such restriction is sufficient given that the claimant has adjusted well to his cognitive academic deficits as demonstrated by his ability to obtain a driver's license and drive and perform at various semi-skilled jobs.  Moreover, as previously noted, the claimant has not encountered more than mild to moderate restrictions in his activities of daily living, social functioning, and concentration, persistence, or pace, nor has he experienced repeated episodes of decompensation.

(Tr. 33).  Here, unlike in the *Mascio* case, the ALJ accounted for the plaintiff's limitations and credibility in determining his RFC prior to proceeding to steps four and five.  Further, the ALJ appropriately explained in the RFC assessment the reasoning for his findings as to the plaintiff's mental limitations (Tr. 27-33).

The plaintiff also argues that the ALJ erred in failing to adopt the testimony of the vocational expert that "concentration difficulties, one or two hours out of the workday" (Tr. 65) would eliminate all jobs (pl. brief at 10).  However, as discussed herein, such a limitation is not supported by the record and, therefore, "an ALJ is not required to accept the answers a [vocational expert] gives to a hypothetical that contains limitations not ultimately adopted by the ALJ."  *Blake v. Colvin*, C.A.No. 0:13-cv-276-DCN, 2014 WL 4955663, at *5 (D.S.C. Sept. 29, 2014) (citation ommitted).

As the vocational expert's testimony was in response to a proper hypothetical question that fairly set out all of the plaintiff's impairments, the undersigned finds no error. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir.1989).

## **CONCLUSION AND RECOMMENDATION**

This court finds that the Commissioner's decision is based upon substantial evidence and is free of legal error.  Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.


s/ Kevin F. McDonald
United States Magistrate Judge

July 13, 2016
Greenville, South Carolina

27